# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH RAINIERI, | ) | CASE NO. 5:18-CV-307 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| ALLIANCE TUBULAR PRODUCTS LLC, | ) | |
| et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion of defendants, Alliance Tubular Products LLC and Alliance Tubular Holdings LLC (collectively "Alliance Tubular"), for summary judgment (Doc. No. 30 ["MSJ"]). Plaintiff Joseph Rainieri ("Rainieri") opposes the motion (Doc. No. 33 ["Opp'n"]), and Alliance Tubular has filed a reply (Doc. No. 34 ["Reply"]). For the reasons to follow, the motion is granted and the case is dismissed.

## I. BACKGROUND

Rainieri was employed by Alliance Tubular as a maintenance shift supervisor from 2014 to February 3, 2017, when he voluntarily resigned to take a position at another company. Rainieri was 56 years of age when he was hired by Alliance Tubular and was 58 when he left. During his tenure with Alliance Tubular, Rainieri reported to Bob McClellan, who was the maintenance superintendent for the Alliance, Ohio, facility. Bob McClellan, in turn, reported to Rob Utley, who was the Alliance Tubular facility plant manager. McClellan was 52 and Utley was 48 when Rainieri resigned. These initial facts are beyond dispute.

In late 2016 or early 2017, Alliance Tubular maintains that it instituted a position requirement for all supervisors that they have a college degree in order to be hired. (Doc. No. 30-14 (Declaration of Robert Utley ["Utley Decl."]) ¶ 6.) According to Alliance Tubular, the college degree requirement was abandoned in July 2017 when the company encountered difficulty filing supervisory positions with college-educated candidates. (*Id*. ¶¶ 7, 8.)

Rainieri began reapplying for the maintenance shift supervisor position shortly after he resigned in February 2017. (Doc. No. 30-2 (Excerpts from Deposition of Joseph Rainieri (Day 1) ["Rainieri Tr."]) at 291[1]; Doc. No. 30-18 (Declaration of John Lamb ["Lamb Decl."]) ¶ 3[2].) It is undisputed that Rainieri applied for reemployment twelve times between February and March 31, 2017; and seventeen times between March 31, 2017, and the end of July 2017. (Lamb Decl. ¶¶ 4–5.) Utley made the first decision not to rehire Rainieri in February 2017. (Utley Decl. ¶¶ 25–26.) According to Alliance Tubular, Utley's initial decision was based on the fact that Rainieri did not meet the then-requirement of a college degree and Rainieri had performance and management deficiencies as a maintenance shift supervisor that caused problems for his superiors and subordinates. (Doc. No. 30-17 (Excerpts from Deposition of Robert Utley ["Utley Tr."]) at 625; Utley Decl. ¶¶ 10–21, 25–27.) Even after the college degree requirement was lifted in July 2017, Alliance Tubular contends that it continued to deny Rainieri reemployment based on Utely's decision that Rainieri was not qualified because of his performance and management deficiencies. (Lamb Decl. ¶ 14.)

Rainieri claims that age discrimination is the real reason behind the decisions not to

---

[1] All page number references are to the page identification number generated by the Court's electronic docketing system.

[2] Lamb was and remains a human resources generalist at Alliance Tubular. (Lamb Decl. ¶ 2.)

rehire him. He also insists that some of the later decisions were motivated, in part, by unlawful retaliation for Rainieri having filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") on March 31, 2018, and for hiring a lawyer sometime between the filing of his charge and the OCRC mediation on May 23, 2017.

On February 7, 2018, Rainieri filed the present lawsuit. In his second amended complaint ("SAC"), he raises claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*; retaliation under Ohio Rev. Code § 4112.02; failure to pay overtime compensation, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b); and willful violation of the FLSA, under 29 U.S.C. § 216(e)(2). (Doc. No. 15 (SAC).) Alliance Tubular moves for summary judgment on all counts, arguing that the undisputed facts show that Rainieri was not denied reemployment due to age discrimination or retaliation for filing an administrative charge, and that he was properly denied overtime compensation.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its resolution affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the court which demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the

opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Anderson*, 477 U.S. at 250. It is the nonmoving party's duty to point out specific facts in the record that create a genuine issue of material fact; the trial court does not have a duty to search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992) (citation omitted).

The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co.*, 536 F. App'x 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street*, 886 F.2d at 1477 (*quoting Anderson*, 477 U.S. at 252).

The district court's review on summary judgment is a threshold inquiry to determine whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

> [Summary judgment is required] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing of an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex,* 477 U.S. at 322–23 (internal quotation marks and citation omitted).

## III. DISCUSSION

### A. ADEA Claim

ADEA makes it unlawful for an employer to "fail or refuse to hire" an individual "because of such individual's age[.]" 29 U.S.C. § 623(a)(1). A plaintiff bringing an ADEA claim "must prove that age was a determining factor in the adverse action that the employer took against him or her." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993) (citing *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 299-30 (6th Cir. 1990)). The Supreme Court has held that the ADEA does not permit "a mixed-motives" claim; instead, a plaintiff alleging a violation of § 623(a) must prove by a preponderance of the evidence that "age was the 'but-for'

cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); *DeBra v. JPMorgan Chase & Co.*, No. 17-1411, 2018 WL 4212493, at *4 (6th Cir. Sept. 5, 2018).

### 1. *Direct Evidence of Age Discrimination*

Age discrimination may be established by either direct or circumstantial evidence. Rainieri suggests that his ADEA claim is based on direct evidence; namely, a remark made by McClellan shortly after Rainieri had advised Alliance Tubular that he was leaving to take another position. It is Rainieri's position that, in a conversation in Rainieri's office during a shift change that took place "probably maybe in January [2017]", McClellan advised Rainieri that he was going to replace Rainieri with someone "stronger than [him] electrically and younger." (Rainieri Tr. at 280-81.) Rainieri suggests that this remark is direct evidence of age discrimination.

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 548 (6th Cir. 2004) (citing, among authority, *Manzer v. Diamond Shamrock Chem. Co*., 29 F. 3d 1078, 1081 (6th Cir. 1994)). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

Determining whether a statement constitutes direct evidence of age discrimination requires an evaluation based on the following factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the [adverse employment action].

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002) (citing *Cooley v. Carmike Cinemas, Inc*., 25 F.3d 1325, 1330 (6th Cir. 1994)). "No single factor is necessarily dispositive and courts should 'tak[e] all of the circumstances into account.'" *Smith v. Chester Cty. Bd. of Educ*., 218 F. Supp. 3d 619, 624 (W. D. Tenn. 2016) (alteration in original) (quoting *Peters*, 285 F.3d at 478).

"'In assessing the relevancy of a discriminatory remark, [courts] look first at the identity of the speaker.'" *Sharp v. Aker Plant Servs. Grp., Inc*., 726 F.3d 789, 798 (6th Cir. 2013) (quoting *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 354 (6th Cir. 1998)). "Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination." *Id.*

Here, it is undisputed that the speaker (McClellan) was not the ultimate decision maker. Alliance Tubular contends that the decision to deny Rainieri reemployment was made by Utley, though Utley concedes that he made his decision "after consulting with" McClellan and John Lamb. (Utley Decl. ¶¶ 25–26.) It was Utley's belief that Rainieri was "not qualified for the position and [Utley] was adamant about not bringing him back." (*Id.* ¶ 26.) As set forth above, Utley insisted that he made the initial decision based on the facts that Rainieri did not have a college degree and that he had performance and management deficiencies. (*Id.* ¶ 27.) According to Utley, Rainieri had "an abrasive and argumentative management style" that interfered with his ability to be an effective shift manager. (*Id.* ¶¶ 10–13.) All subsequent decisions to deny Rainieri reemployment, include those made after the college degree requirement was lifted, were based upon Utley's initial decision that Rainieri's management deficiencies rendered him unqualified for the position. (Lamb Decl. ¶ 14.)

In evaluating the actions of a non-decision maker, "a biased employee's 'position [of] influence' is probative of that employee's ability to influence the ultimate decisionmaker." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012) (quoting *Ercegovich*, 154 F.3d at 355)). All that is know about McClellan's role in the decision-making process is that he (along with Lamb) "provided input" but that the decision was made by Utley, who was "adamant" in his determination that Rainieri was not qualified for the position. (Utley Decl. ¶ 25.) However, given the fact that McClellan was Rainieri's immediate supervisor, and viewing the evidence in a light most favorable to Rainieri, the evidence supports a reasonable inference that McClellan had a significant influence on the decision-making process. This factor weighs in favor of finding the existence of direct evidence of discrimination.

Addressing the second prong of the test, the Court finds that the remark—made before Alliance Tubular was even aware that Rainieri was interested in returning to Alliance Tubular— does not relate to the decision-making process relative to Rainieri's employment. The Sixth Circuit has held that "when managers make age-biased statements *outside the context of the decision to discharge the plaintiff*, the statements are not direct evidence of age discrimination." *Chattman*, 686 F.3d at 347 (citing *Rowan*, 360 F.3d at 550) (emphasis added). In *Rowan*, the court found that statements made by various members of the employer's management team about the general need to lower the average age of their workforce did not constitute direct evidence of age-based bias *against the plaintiffs, themselves*. *Rowan*, 360 F.3d at 548. Similarly here, a comment made by McClellan, before Alliance Tubular even knew that Rainieri would seek reemployment, cannot constitute direct evidence that Rainieri was denied reemployment because of his age. This factor weighs against a finding of direct evidence.

The third and fourth prongs of the test can be addressed together. There is no question that the first decision to deny Rainieri reemployment was made in close temporal proximity to McClellan's remark that he was interested in hiring someone "younger." However, this isolated remark is simply too ambiguous and general to support an inference of discrimination. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008) ("[G]eneral, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus."); *see also Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524–25 (6th Cir. 2007) (finding statement that supervisor removed an employee from account because he was "too old" did not constitute direct evidence of age discrimination because the statement was not related to the plaintiff's termination), *overruled on other grounds by Gross*, 557 U.S. 167; *Rowan*, 360 F.3d at 548–49 (finding employer's nebulous remarks about the general need to lower the average age of the workforce and stray comment that "the older people should go, bring in some new blood," were not direct evidence of unlawful age bias).

Far from evidencing a clear and unmistakable intent to discriminate against Rainieri on the basis of his age, McClellan's remark requires the fact finder to draw several inferences to reach the conclusion that age discrimination was the "but-for" cause of the adverse employment decisions involving Rainieri. Accordingly, the Court finds that this stray remark—made by someone involved in the decision-making process but not the decision maker and before Alliance Tubular was even aware that Rainieri would seek reemployment—does not rise to the level of direct evidence of age discrimination. *See, e.g.*, *Fabec v. STERIS Corp*., No. 1:04 CV 2062, 2005 WL 2313916, at *6–7 (N.D. Ohio Sept. 21, 2005) (rejecting as direct evidence isolated comment

"I need to get rid of the old people"); *Swanson v. McKesson Corp.*, No. 1:04-CV-454, 2006 WL 143223, at *4 (S.D. Ohio Jan. 18, 2006) (holding that supervisor's stray reference to plaintiff as "old guy" was not direct evidence of age discrimination as it was not tied to any employment decision).

### 2. *Circumstantial Evidence of Age Discrimination*

Nevertheless, even without direct evidence of age discrimination, Rainieri alleges that he can prevail on his ADEA claim through the presentation of circumstantial evidence. Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting *Wexler*, 317 F.3d at 570).

The Court applies the evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to analyze ADEA claims based on circumstantial evidence. "Under that framework, a plaintiff must produce enough evidence to establish a prima facie case of age discrimination, namely: '(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *DeBra*, 2018 WL 4212493, at *4 (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002))).

Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and "the burden of production shifts to the defendant to articulate a non-discriminatory reason for its action." *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001). If defendant articulates a nondiscriminatory reason, the presumption is rebutted, and the burden shifts back to plaintiff to

show that the reason was a pretext for age discrimination. *Id.* "This Circuit recognizes three ways for a plaintiff to prove that the employer's stated reason is pretextual: (1) the reason has no basis in fact, (2) the reason did not actually motivate the [adverse employment action], or (3) the reason was insufficient to motivate the [adverse employment action]." *DeBra*, 2018 WL 4212493, at *4 (citing *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012)). At all times, "the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Id.* (internal quotations omitted).

Here, the parties devote considerable effort to debating whether Rainieri has established the existence of a prima facie case of discrimination. However, even assuming the existence of a prima facie case, the age claim ultimately fails because the evidence advanced by Rainieri to rebut Alliance Tubular's legitimate articulated reasons does not provide a basis upon which a reasonable jury could conclude that the stated reasons were a pretext for unlawful age discrimination.[3]

---

[3] It is true that the same evidence used to establish a prima facie case may be relied upon by a plaintiff to demonstrate pretext. *See Henry v. Lennox Indus., Inc.*, 768 F.2d 746, 751 (6th Cir. 1985) (holding that in some cases, a plaintiff's evidence supporting a prima facie case will also suffice to demonstrate pretext). However, even when evidence is sufficient to raise some suspicion sufficient to establish a prima facie case, it may still be insufficient to establish pretext if the evidence "could not lead a reasonable jury to conclude that the numerous legitimate reasons offered by [the employer] were merely a pretext for age-biased discrimination." *See, e.g.*, *Rowan*, 360 F.3d at 548.

Rainieri admits that he does not have evidence that his age was the "but for" reason he was not reemployed by Alliance Tubular. (Rainieri Tr. at 280-89.) In fact, he concedes that his age may have had nothing to do with Alliance Tubular's refusal to rehire him. (*Id*. at 288–89.) Instead, he merely "believes" his age had something to do with Alliance Tubular's decision.[4] (*Id*. at 269–70, 272–73.) However, more than an unsubstantiated suspicion is necessary to survive summary judgment. *Peters*, 285 F.3d at 470 ("[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." (second alteration in original)); *Jones v. City of Warrensville Heights*, No. 1:18 CV 647, 2019 WL 1077691, at *9 (N.D. Ohio Mar. 6, 2019) (holding that a plaintiff's subjective belief, without more, is insufficient as a matter of law to support a claim of age discrimination).

As previously discussed, Alliance Tubular maintains that Rainieri was not qualified for the position, owing, in part, to his lack of a college degree. McClellan and others testified consistently that a college degree was a requirement for all supervisory positions from February through July 2017. (Doc. No. 30-15 (Excerpts from Deposition of Robert McClellan ["McClellan Tr."]) at 586–87; *see* Utley Tr. at 625; Doc. No. 30-19 (Excerpts from Deposition of John Lamb ["Lamb Tr."]) at 637; Utley Decl. ¶¶ 6–7.) This showing, alone, was sufficient to meet Alliance Tubular's non-onerous burden to articulate a legitimate nondiscriminatory reason.

---

[4] Rainieri testified that he believed that management was interested in hiring younger employees because the workforce was getting older and would be retiring soon. (Rainieri Tr. at 273–74.) In fact, he testified that he would give his superiors a "heads up" if an employee indicated that he was thinking about retirement so that management would be able to "plan" for the future. (*Id.* at 274.) Of course, inquiries into an employee's retirement plans generally do not constitute age discrimination. *Sanders v. Gray Television Grp., Inc.*, 478 F. App'x 256, 265 (6th Cir. 2012); *see, e.g.*, *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 331 (6th Cir. 2012).

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (explaining the law places on the employer only the burden to articulate one or more legitimate nondiscriminatory reasons for the adverse employment decision); *see Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814–15 (6th Cir. 2011) (noting that "it is sufficient for [the employer] to raise a genuine issue of fact as to whether it discriminated against [the plaintiff]").

Rainieri dismisses the short-lived college degree requirement as "highly suspicious" and "questionable at best[.]" (*See* Opp'n at 1492–93). He complains that members of Alliance Tubular's management team were unable in deposition testimony to "pin down the exact dates of this alleged policy that supposedly came from the corporate office, which also does not appear to have been issued in writing."[5] (Opp'n at 1492 (collecting record cites).) He also points to the fact that McClellan—who was not hired during the time the degree requirement was purportedly in effect—did not have a college education. (*Id*. at 1493 (citing McClellan Tr. at 1516).) Yet, Rainieri fails in any way to refute the undisputed evidence that no applicant without a college degree was hired for a supervisory position during the relevant time period. (Utley Tr. at 626–27.) Without more, Rainieri's mere disbelief that his lack of a college degree was one legitimate reason his early applications for reemployment were denied is insufficient to establish pretext. *See Mitchell v. Toledo Hosp*., 964 F.2d 577, 585 (6th Cir. 1992) ("Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a . . .discrimination claim to withstand a motion for summary judgment.") (citing, among authority, *Ridenour v. Lawson Co*., 791 F.2d 52 (6th

_____

[5] All members of management for Alliance Tubular testified consistently as to the general time frame for the policy. Further, both Lamb and Utley testified that the policy was instituted by Eric Crump, Alliance Tubular Chief Operating Officer. (Utley Tr. at 626; Lamb Tr. at 635.) There is no indication that Crump was deposed or otherwise asked the exact date that he instituted the policy.

Cir. 1986)).

Furthermore, Rainieri does not even address Alliance Tubular's second articulated reason for the adverse employment actions—management deficiencies. Rainieri insists that his performance while at Alliance Tubular exceeded that of other shift supervisors, including the two shift supervisors who were employed while Rainieri was at Alliance Tubular—Joe Courtright and Keith Russell. Rainieri posits that his own performance reviews were on par with or exceeded those of his contemporaries, and that, unlike Courtwright who was once suspended for insubordination, he was never disciplined for poor performance or inappropriate behavior. He also maintains that he was more qualified than Thomas Ledford, the individual who was ultimately awarded Rainieri's position after the college degree requirement was lifted.[6] He underscores the fact that Ledford had no prior supervisory experience, no college degree, and had previously abandoned a prior job with Alliance Tubular. (Opp'n at 1492–93.)

There are several problems with Rainieri's position. First, an employee's "subjective view of [his] qualifications in relation to those of other applicants [or employees], without more, cannot sustain a claim of discrimination." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004); *see Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (finding employee's "perception of his competence, and the incompetence of those competing against him, is irrelevant"); *DiOrio v. TMI Hosp., L.P.*, 4:15-cv-1710, 2017 WL 4810704, at *6–7 (N.D. Ohio Oct. 25, 2017) (noting an employee's evaluation of his own performance or qualifications is irrelevant as a matter of law) (collecting cases). Second, and more importantly, the fact that an

---

[6] The position was originally offered to Marty Geul, who accepted the position but never began working at Alliance Tubular.

employee may have met or exceeded company expectations in certain respects does not establish that a company's proffered reason for finding an employee's performance in other areas deficient is a pretext for discrimination. *See Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 612 (6th Cir. 2013) (citing *Wright v. Sears, Roebuck & Co.*, 81 F. App'x 37, 42–43 (6th Cir. 2003)). It was Alliance Tubular's position that Rainieri "acted like a hammer and everyone else was a nail," and that this abrasive management style created conflicts between his supervisors and subordinates. (Utley Decl. ¶¶ 12–13.) In his affidavit, Utley averred that, "[o]n more than one occasion, [Utley] was called on to address and ease employee tensions caused by Rainieri's actions and comments[,]" and that Utley even had to conduct a weekly standing meeting with the union to "address and deal with issues created by . . . Rainieri's antagonistic approach with his subordinates who were union members." (*Id.* ¶¶ 14–15; *see also id.* ¶ 16.)

Rainieri does not advance any evidence that these weekly meetings did not take place, or otherwise demonstrate that the impetus for these meetings was anything other than his own deficient management style. In fact, he has offered no evidence that Utley's decision to deny him reemployment was not grounded in an honest belief that Rainieri was an abusive and ineffective manager. When an employer "reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Immormino v. Lake Hosp. Sys., Inc.*, 127 F. Supp. 3d 829, 837 (N.D. Ohio 2015) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009)). A "laxer standard would move [the] court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a super personnel department, overseeing and second guessing employers' business decisions." *Bender v. Hecht's Dep't Stores*,

455 F.3d 612, 627–28 (6th Cir. 2006) (quotation marks omitted). Rainiei has failed to advance evidence to rebut Alliance Tubular's second legitimate articulated reason for failing to rehire him and has, therefore, failed to show pretext. Accordingly, Alliance Tubular is entitled to summary judgment on Rainieri's ADEA claim.

### B.    Retaliation Claim

The ADEA prohibits employers from retaliating against a person for opposing or reporting age discrimination. 29 U.S.C. § 623(d). Ohio law is similar. Ohio Rev. Code § 4112.02(I). In evaluating a retaliation claim, the same *McDonnell Douglas* framework is applied as with claims of age discrimination.

> To establish a prima facie case of retaliation under either federal or Ohio law, a plaintiff must show that (1) [he] engaged in a protected activity, (2) the defending party was aware that the [plaintiff] had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse action.

*Blizzard*, 698 F.3d at 288 (quotation marks omitted).

An employee "may not invoke the protections of the Act by making a vague charge of discrimination." *Id.* That said, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "In order to prevail on a claim of retaliation where the defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must prove not only that the defendant's proffered reason was a pretext, but that the real reason for the employer's action was intentional retaliation." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

There are several undisputed facts that stand between Rainieri and a jury trial on his

retaliation claim. First, Utley made the first decision not to rehire Rainieri shortly after Rainieri resigned in February 2017, presumably on the grounds that Rainieri was not qualified for the position. (Utley Decl. ¶¶ 25–27.) Rainieri did not file his charge of discrimination until March 31, 2017, and he participated in an OCRC mediation on May 23, 2017. Rainieri does not identify any evidence that indicates when, prior to May 23, 2017, Alliance Tubular would have been aware of his protected activity and he cites to nothing in the record that, if believed, would suggest that Utley was aware that Rainieri was pursuing an administrative charge before he made his initial decision to refuse to reemploy him. Accordingly, the initial decision cannot support even a prima facie case of retaliation. *See Hamilton v. Starcom Mediavest Grp., Inc*., 522 F.3d 623, 268 (6th Cir. 2008) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 n.3 (6th Cir. 1999) (en banc) ("[T]he defendant must have known about the protected activity in order for it to have motivated the adverse action.")).

Even after Alliance Tubular became aware of his protected activity, Rainieri would still have to demonstrate a causal connection between the protected activity and the adverse action to establish a prima facie case of retaliation. To do this, Rainieri must marshal evidence "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp*., 104 F.3d 858, 861 (6th Cir. 1997) (quotation marks omitted). Yet, Rainieri concedes that Alliance Tubular made the same decision to deny him reemployment before and after he engaged in protected activity.[7] (Opp'n at 1495.) While Rainieri opines that a pre-activity adverse decision does not necessarily foreclose post-activity retaliation (*see* Opp'n at

---

[7] Indeed, 12 of the 29 times Rainieri applied for reemployment occurred before Rainieri filed his charge on March 31, 2017. (*See* Lamb Decl. ¶¶ 4–5.)

1495–96), without some evidence of retaliation, it effectively refutes any inference that the subsequent concerted activity was the cause of the employment decision. *See Walcott v. City of Cleveland*, 123 F. App'x 171, 178 (6th Cir. 2005) (holding that plaintiff "failed to establish a causal connection between the filing of her EEOC charges and the failure to promote her, because she cannot demonstrate that she was treated differently before and after the filing of the EEOC charges").

In attempt to meet his burden of proof, Rainieri points to the temporal proximity between the subsequent decisions and his concerted activity. However, "[t]emporal proximity alone, without additional evidence of a retaliatory animus, will not suffice to support a finding of a causal connection." *Walcott*, 123 F. App'x at 178 (citing *Hafford v. Seidner*, 183 F.3d 506, 516 (6th Cir. 1999)). Even authority relied upon by Rainieri makes clear that something in addition to temporal proximity is necessary to bridge the gap between conjecture and the establishment of a causal connection. *See Harrison v. Metro. Gov't of Nashville*, 80 F.3d 1107, 1119 (6th Cir. 1996) (finding fifteen months between termination and EEOC charge, considered in conjunction with evidence that three other employees who testified on the plaintiff's behalf feared retaliation, was sufficient to establish the necessary causal connection), *overruled on other grounds by Metro. Gov't of Nashville v. Harrison*, 519 U.S. 863, 117 S. Ct. 169, 136 L. Ed. 2d 111 (1996) ; *see also Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (holding that close proximity in time between the adverse decision and the protected activity, considered along with other actions such as unwarranted criticism of plaintiff's work and more frequent disciplinary writeups, "[w]hen viewed as a whole[,]" supported the jury's finding of retaliation).

Rainieri's retaliation claim under Ohio law is properly dismissed.

## C.     FLSA Claim

Generally under the FLSA, any employee who works more than forty (40) hours in a workweek must receive overtime compensation. *See* 29 U.S.C. § 207(a)(1). However, an employer need not pay overtime if the employee is "employed in a bona fide executive, administrative, or professional capacity" as defined by regulations or promulgated by the Secretary of Labor. *See* 29 U.S.C. § 213(a)(1).

Alliance Tubular asserts that Rainieri, as a maintenance shift supervisor, was an "executive employee" exempt under the FLSA. *See* 29 C.F.R. § 541.00. FLSA overtime exemptions are "affirmative defense[s] on which the employer has the burden of proof[,]" *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974), and those exemptions "are to be narrowly construed against the employers seeking to assert them[.]" *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960); *see Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). The Sixth Circuit has further observed that an employer "must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption." *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 691 n.4 (6th Cir. 2001) (quoting *Roney v. United States*, 790 F. Supp. 23, 26 (D.D.C. 1992)). Nonetheless, "the employer claiming an FLSA exemption does not bear any heightened evidentiary burden." *Thomas*, 506 F.3d at 501–02. In *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007), the court explained:

> We clarify here that the phrase "clear and affirmative evidence" does *not* heighten [the defendant's] evidentiary burden when moving for summary judgment. The word "clear," as used in this phrase, traces to the "clearly erroneous" Rule 52(a) standard, but that standard is inapposite to our current review of a motion for summary judgment. And because establishing the applicability of an FLSA

exemption is an affirmative defense, [the defendant] has the burden to establish the . . . elements by a preponderance of the evidence[.]

The Department of Labor regulations, as amended in 2004, provide that an employee qualifies for the executive exemption if the employee: (1) is paid a salary not less than $455.00 per week; (2) has a primary duty of management "of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (3) regularly directs two or more employees; and (4) has "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(1)–(4); *see Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 629 (E.D. Tex. 2008). The parties agree that Rainieri's weekly earnings as a shift supervisor exceeded $455.00, and, thus, the first element is not in dispute. (MSJ at 238, n.15 (collecting record cites).) Further, Rainieri does not seriously dispute that Alliance Tubular has advanced sufficient unrebutted record evidence to support the second and third elements. Nonetheless, Rainieri maintains that Alliance Tubular is not entitled to summary judgment on his FLSA claim because Alliance Tubular has "failed to demonstrate the fourth factor of the executive exemption test under the FLSA[.]" (Opp'n at 1497.)

1. *Rainieri's Primary Duty was One of Management*

As the second and third elements are essentially uncontested, the Court will only briefly touch on the evidence supporting those elements. Turning first to the question of plaintiff's "primary duty," the regulations define this term as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Courts are directed to make the determination as to the employee's primary duty based on "all the facts in a particular case." *See Thomas*, 506 F.3d at 504 (quoting 29 C.F.R. § 541.103).

Under the regulations, "management" work is exempt work. *See* 29 C.F.R. § 541.100. The regulations provide that "management" includes:

> [A]ctivities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints or grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

As a maintenance shift supervisor, Rainieri's "primary duty" was managing the maintenance department and supervising and directing the work of the hourly maintenance workers on his assigned shift. (Rainieri Tr. Ex. 7 (Resumes of Joseph Rainieri ["Rainieri Resumes"]) at 407–08; Doc. No. 30-3 (Excerpts from Feb. 19, 2019 Deposition of Joseph Rainieri (Day 2) ["2d Rainieri Tr."]) at 342–44, 369–71); McClellan Tr." at 581–82, 593.) In fact, Rainieri wrote on his resume (and subsequently testified to the accuracy of his resume) that he "[s]upervise[d] up to 10 skilled union maintenance technicians[,]" "[s]cheduled overtime as needed," and "[a]dminister[ed] discipline as needed[,]" among other duties. (2d Rainieri Tr. at 341–42, 343–44; Rainieri Tr. Ex. 7.) He also made staffing decisions on his shift and tracked attendance. (Rainieri Tr. at 302, 303, 304; (2nd Rainieri Tr. at 354, 367, 377, 380–81; Rainieri Tr. Exs. 7, Ex. 9 (text messages), Ex. 10 (discipline administered by Rainieri).)

The record further established that maintenance shift supervisors were responsible for ensuring the safety of the employees on their shift. (Rainieri Tr. 320; Utley Tr. at 617–18.) They

also handled employee complaints and grievances, "stud[ied] production schedules and prepare[d] estimates of worker hour requirements for completion of job assignment[s]," and generated incident reports if any accidents occurred. (Rainieri Tr. 320; 2nd Rainieri Tr. 365, 380; Utley Tr. at 617–18; McClellan Tr. at 592.) Finally, Rainieri concedes that he was typically the highest ranking employee—and the only supervisory employee—in his department during most hours of his shift. (Rainieri Tr. at 300–01.)

These undisputed job duties and activities demonstrate that Rainieri "exercised discretion over important managerial functions on a sufficiently frequent basis to support a finding that management was [his] primary duty."[8] *Thomas*, 506 F.3d at 507. Accordingly, the Court finds that Alliance Tubular has carried its burden of establishing that the position of maintenance shift supervisor satisfied the second element of the executive exception test. *See, e.g.*, *Burson v. Viking Forge Corp.*, 661 F. Supp. 2d 794, 803 (N.D. Ohio 2009) (finding primary duty of shift supervisor with similar managerial responsibilities described in § 541.102 was that of management); *Mosquera*, 745 F. App'x at 572 (finding supervisor's own resume demonstrated that his primary duty was management).

---

[8] Rainieri cites *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008), for the proposition that management cannot be a primary duty when the employee spends 80 to 90% of his time performing nonexempt tasks. (Opp'n at 1499). However, he points to nothing in the record that would suggest how much time he spent on exempt versus nonexempt tasks. Instead, he merely notes that his eventual replacement, Thomas Ledford, failed to mention at his deposition the responsibilities of hiring, firing, or disciplinary employees in the laundry list of tasks of a maintenance shift supervisor. (*Id*. (citing page ID # 1272).) However, Ledford was never asked whether he had the authority to hire, fire, or discipline employees, and when he was asked to list his job duties, he indicated that "I am sure there is more that I have left out . . . ." (Doc. No. 31-3 (Deposition of Thomas Ledford ["Ledford Tr."]) at 1209–10.) Even though Alliance Tubular bears the burden on the affirmative defense of exemption, Rainieri cannot defeat a well supported summary judgment motion with vague arguments unsupported by specific evidence that would identify a genuine issue of fact for trial. *See generally Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018) (finding supervisor's "best guess" on the amount of time he spent on nonexempt tasks, unsupported by record evidence, was insufficient to withstand summary judgment).

2. *Plaintiff Regularly Directed Two or More Employees*

The Court finds that Alliance Tubular has also satisfied the third element of the "executive" exception—that Rainieri regularly directed two or more employees. In fact, Rainieri testified that he directly supervised ten or more maintenance employees on his shift. (Rainieri Tr. at 19–20, 77; Rainieri Tr. Ex. 7.) According to his own testimony, it was the responsibility of the maintenance shift supervisors to "account for" the maintenance technicians, schedule over time as needed, "pass out work orders," "follow-up on jobs that had been started and see that they were completed," watch breaks," "keep track of time cards," "talk . . . about any issues" that arose during shift, ensure that work rules were followed, and give guidance and instructions on how to fix problems. (2nd Rainieri Tr. 342–43, 349–56; Rainieri Tr. Ex. 7.) Again, Rainieri also specifically conceded that, at least for portions of each shift, he was highest ranking management employee available to direct the work of the shift.

3. *Rainieri's Recommendations Were Given Particular Weight*

This leaves the question of whether Rainieri had the "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Under the regulations, "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." § 541.105. *See Rainey*, 552 F. Supp. 2d at 631–32.

The governing regulation provides, in part:

To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker.

29 C.F.R. § 105.

With respect to hiring, Rainieri notes that Alliance Tubular has failed to come forward with any evidence that maintenance shift supervisors participated in the initial hiring process. (Opp'n at 1497–98.) However, the record reflects that all new hires at Alliance Tubular were required to complete a probationary period that lasted hundreds of hours. (Rainieri Tr. at 335; Utley Decl. ¶ 28.) One of the duties of a maintenance shift supervisor was to evaluate the probationary employees on their shift and report this evaluation to their respective supervisor. (Utley Decl. ¶ 31; Rainieri Tr. at 335–38.) At the end of the probationary period, the maintenance shift supervisor was expected to make a recommendation as to whether the temporary employee should be offered full-time employment. (Utley Decl. ¶ 32). By way of example, Alliance Tubular identified two probationary employees—Leonard Passman and Ray Williams—who were ultimately hired upon Rainieri's recommendation. (*Id*. ¶¶ 34, 35.) Rainieri also gave a negative report regarding one probationary employee and the recommendation led to Alliance Tubular not offering that individual full-time employment. (Utley Tr. at 628; Utley Decl. ¶ 36.) While Rainieri dismisses these examples as failing to establish any frequency, Utley offered unrebutted testimony that he was not aware of a time when Rainieri's recommendation as to retaining probationary employees was *not* followed. (Utley Decl. ¶ 33.)

As for firing and disciplining employees, as a maintenance shift supervisor, Rainieri was responsible for issuing and/or recommending discipline for hourly employees on his shift. (Rainieri Tr. at 297–99, 324–25; 2nd Rainieri Tr. at 345–36, 355–57, 374, 383, 384–87, 388; Rainieri Tr. Exs. 7, 10; Utley Tr. at 615; McClellan Tr. at 591.) Indeed, the record shows that Rainieri had disciplined subordinates for violations of the company's attendance policy, safety rules and work rules; not performing their assigned work; using inappropriate language; causing property damage; and insubordination. (Rainieri Tr. at 297–99, 324–25; 2nd Rainieri Tr. at 350–51, 352, 363–64, 374–75, 376, 378–80, 382, 383, 384–87, 388; Rainieri Tr. Exs. 7, 10; Utley Tr. at 615, 617–18; McClellan Tr. at 591–92, 596–97, 603–04, 604–05.) The discipline available to maintenance shift supervisors included anything from verbal warnings to suspension. (2d Rainieri Tr. at 356, 374, 378–80, 383, 384–93, 388; Rainieri Tr. Exs. 7, 10; McClellan Tr. at 591–92, 594–95, 602–05; Utley Tr. at 618.) Alliance Tubular points to an example of an employee to whom Rainieri issued a five-day suspension (pending a disciplinary hearing to determine whether the employee should be discharged) based on Rainieri's recommendation. (McClellan Tr. at 595, 602–03, 604–05.) In the end, the company retained the employee on Rainieri's recommendation that the employee not be terminated. (*Id.*)

Rainieri attempts to minimize his role in the firing and disciplinary process by suggesting that his authority to "discipline" was limited to "simply reporting infractions to management." (Opp'n at 1498.) He describes his function as a mere "witness or documentarian to objective

policy violations[.]" (*Id*.) He underscores the fact that he "never terminated anyone[,]" and that his disciplinary decisions required the approval of his supervisor. (*Id*. at 1498–99.)[9]

"Yet, nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive.'"[10] *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, 1017 (E.D. Mich. 2005). In *Beauchamp*, supervisors evaluated new hires to determine whether they should continue to work for the company. *See id*. at 1016. Additionally, in *Beauchamp*, the supervisors typically initiated the disciplinary process that would lead to an employee's discharge. *Id*. The court found this to be enough to comport with the regulatory requirement that the executive's recommendations and suggestions as to hiring and firing were given particular weight. *Id.*; *see*

---

[9] As for Alliance Tubular's example of the employee who was discharged upon Rainieri's recommendation, Rainieri notes that he, himself, was the victim of the insubordinate employee's behavior and that this fact should mitigate the importance of such an example. (*Id*. at 1498.) In conclusory fashion and without any support, Rainieri represents that "[i]t is not uncommon for employers to ask the victims of workplace harassment what they would like to happen to their harasser." (*Id*. at 1498.)

[10] Moreover, the fact that workplace conduct was governed by company policies and practices does not diminish a supervisor's role in enforcing those policies. "'[E]nsuring that company policies are carried out constitutes the very essence of supervisory work.'" *Beauchamp*, 357 F. Supp. 2d at 1017 (quoting *Donovan v. Burger King Corp*., 672 F.2d 221, 226 (1st Cir. 1982)).

*Rainey*, 552 F. Supp. 2d at 632 (finding similar hiring and progressive discipline process initiated by supervisor was sufficient to satisfy the "particular weight" requirement); *see, e.g.*, *Burson*, 661 F. Supp. 2d at 805 (finding initiation of disciplinary process by shift supervisor sufficient to satisfy fourth element). The Court finds the reasoning in *Beauchamp* and *Rainey* persuasive and holds that Alliance Tubular has satisfied the fourth and final requirement of the executive exemption.

Alliance Tubular has established as a matter of law that each of the four factors supports its designation of the maintenance shift supervisor position as exempt. Therefore, Alliance Tubular has satisfied its burden on summary judgment of demonstrating that Rainieri was qualified as a bona fide executive employee under FLSA, and Rainieri's FLSA claim, therefore, is dismissed.[11]

### IV. CONCLUSION

For the foregoing reasons, Alliance Tubular's motion for summary judgment is granted. This case is dismissed.

**IT IS SO ORDERED**.


Dated: July 16, 2019

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[11] Because the undisputed record supports the application of the executive exception, the Court need not consider whether the position of maintenance shift supervisor also satisfies the administrative exception. Additionally, because there was no FLSA violation, the Court need not consider whether the violation was willful.